peace, as Mr. Howard seems to suppose. (See vol. 29 of his Reports, 68.)

A new trial for irregularity, or for any error of the jury at the circuit, must be applied for in the first instance at a special term of the Supreme Court; and so a new trial for irregularity or for an error of the jury in the County Court must be asked for in that court.

This note is made in consequence of the criticism upon Broughton a. Mitchell (29 *How. Pr.*, 68). (B.)

## LOESCHIGK a. ADDISON.

*New York Superior Court; General Term, July,* 1865.

JUDGMENT.—DECISION OF JUDGE.—APPEAL.—CREDITOR'S SUIT.—
FRAUDULENT CONVEYANCES.

Where a cause is tried upon issues of fact, by the court without a jury, the judgment entered upon the decision must not contain any provisions not embraced in the decision.

The conclusions of law found by the court must contain all that goes into the judgment.

If any thing is inserted in the judgment which is not contained in the decision, the judgment is not merely irregular, but is substantially erroneous, and will be reversed on appeal.

A surviving partner is vested with the partnership assets for the purpose of applying them to the payment of partnership debts equitably; and has not power to assign the whole assets to the preference of some creditors and the exclusion of others. (Per McCunn, J.)

A creditor's action should not be absolutely dismissed for defect of parties, unless the objection be taken by pleading. (Per McCunn, J.)

What is sufficient evidence of fraud to avoid a voluntary gift made by a debtor, considered. (Per McCunn, J.)

Appeal by both parties from a judgment.

This action was brought by the plaintiffs, William Loeschigk, Otto Wesendonk, Gustavus Kutter, and Edward Luckemeyer,

judgment-creditors of Samuel D. Addison, as survivor of Joseph Addison, against the defendants, to set aside as fraudulent and void certain conveyances, assignments, and transfers of property made by Samuel D. Addison to the defendant Rachel A. Addison, and also to the defendants Hatfield & Marshall.

The cause was tried by Mr. Justice Barbour, without a jury, who found the facts established by the evidence, and thereupon rendered the following decision:

And, as conclusions of law upon the facts, I do decide and determine: That the deed of September 18, 1857, from Samuel D. Addison to Amos F. Hatfield, and the deed of the same premises from said Hatfield to Rachel A. Addison, are not fraudulent and void as against the plaintiffs; and that the goods mentioned in the complaint as transferred by Samuel D. Addison, survivor, to Hatfield & Marshall, cannot be reached in this action; and the said Samuel D. Addison, survivor as aforesaid, had no power to assign the said collateral securities of Addison Brothers in the Pacific Bank to the said Hatfield & Marshall; and that the said assignment be declared void.

Upon filing such decision, the clerk entered the following judgment:

[TITLE.]

"This cause having been tried before the Hon. John M. Barbour, without a jury, on the issues joined by the pleadings; and the decision in writing of the justice, containing a statement of the facts found, and the conclusions of law separately, according to the statute in such cases made and provided, having been filed; now, on motion of Mr. Watson for plaintiffs, it is ordered, adjudged, and decreed that the deed of September, 1857, from Samuel D. Addison to Amos F. Hatfield, is not fraudulent and void as against the plaintiffs, but is valid; and that the goods mentioned in the complaint as transferred by Samuel D. Addison, survivor, to Hatfield & Marshall, and the leases mentioned in the complaint, cannot be reached in this action; and that the assignment of the collateral securities of Addison Brothers in the Pacific Bank to Hatfield & Marshall

is void for want of power in the said Addison, as survivor, to make the same; that the said defendants Hatfield & Marshall assign, under oath, to a receiver to be appointed by this court, all their interest in collateral securities in the Pacific Bank, which were assigned to them by Samuel D. Addison, and as indemnity against the suits in replevin aforesaid, as mentioned in the pleadings and proofs; and that said Hatfield assign to the receiver the promissory notes of James N. Clark, Cordell, Avery, and Burr, William Collins, H. A. Lucas, and all other securities held by him, in the same manner as the notes above-named.

" And that the said Rachel A. Addison, administratrix of the said Samuel D. Addison, join in the said conveyance; and that the plaintiffs hereby have judgment to that effect, and for their costs of this action, adjusted by the clerk at $101.06, against the defendants Amos F. Hatfield and Jesse A. Marshall, and have execution thereon.

" And it is further adjudged and decreed that the receiver to be appointed in said suit pay to the plaintiff the amount of said judgments in the complaint mentioned out of the proceeds of property of the defendant, to be assigned to him as hereinafter mentioned; and that the said receiver bring the residue of the proceeds of the said property into court to abide the further order thereof; and that the complaint be dismissed as against the said Rachel A. Addison individually, and her costs, adjusted by the clerk at $53.81, to be paid by the receiver out of the fund in his hands; and if the same be insufficient, that said costs be paid by the plaintiffs.

"ROBERT D. LIVINGSTON, Clerk.

"Filed, January 19, 1862, at 3 P. M."

From this judgment all the parties appealed; the plaintiffs appealing from some parts, and the defendants respectively from those parts which awarded costs to the plaintiffs or to the defendants, to be paid out of the fund.

*W. Watson*, for the plaintiffs.

*A. R. Dyett*, for the defendants.

BY THE COURT.*—MONELL, J.—The only judgment which could be entered upon the decision of the justice who tried this cause was, that the deed to Rachel A. Addison was not fraudulent and void; ·that the goods transferred to Hatfield & Marshall could not be reached in this action, and that the assignment of the securities in the Pacific Bank was void. This was the whole of the decision. The learned justice did not determine any other question, and the judgment which it was proper to enter should have embraced only the points decided.

The paper purporting to be a judgment, and which recites the decision of the court, and from which both parties have appealed, contains several provisions wholly unauthorized by the decision; such as adjudging the deed from Addison to Hatfield to be valid; that Hatfield & Marshall assign under oath, to a receiver to be appointed, their interest in the securities in the Pacific Bank; that Hatfield assign to the receiver the promissory notes of Clark, &c.; that Rachel A. Addison join in the conveyance; that the plaintiffs have judgment for their costs against Hatfield & Marshall; that the receiver pay the plaintiffs the amount of judgment out of the proceeds of the property to be assigned to him; that the balance of the proceeds be brought into court to abide the further order; that the complaint be dismissed as against Rachel A. Anderson individually, and her costs be paid by the receiver out of the funds in his hands, and if such fund is insufficient, the same to be paid by the plaintiffs.

There was no authority in the decision for any portion of the judgment above recited. The Code requires that, upon the trial of questions of fact by the court, its decision must be given in writing (the conclusions of fact and law being separately stated), and judgment is entered upon the decision. (*Code,* § 267.)

In Chamberlain *a.* Dempsey (14 *Abbotts' Pr.,* 241) this court decided that, in an action tried by the court without a jury, the only authority for entering judgment is the decision of the judge who tried the cause.

The clerk cannot go beyond the decision, and include any thing in the judgment not embraced in the decision.

---

* Present, MONCRIEF, MONELL, and McCUNN, JJ.

In the case before us the "decision" does not award costs to either party. Costs in this class of cases are wholly in the discretion of the court, and the question of costs must be disposed of by the court in its decision.

As I understand the requirement of the Code, and as determined in Chamberlain *a.* Dempsey (*sup.*), the conclusions of law must contain all that goes into the judgment; and it makes no difference that the judgment (as entered in this case) received the fiat of the justice who tried this cause. Such fiat (and there is no evidence in the papers that it had the fiat) was unnecessary, as the clerk, in filing the decision, is authorized to enter judgment without any other direction of the judge. (*Code,* § 267.) It is to the decision alone, therefore, that we must look for the determination of the judge; and any thing in the judgment, not in the decision, is improper and erroneous.

This is not an irregularity merely, but a substantial error. Parties cannot appeal from a decision, but from a judgment; and if the judgment is unauthorized by the decision, it must be set aside. (Chamberlain *a.* Dempsey, *sup.*, ROBERTSON, J.)

For the reasons stated, we think the judgment must be reversed, and as all the issues in the case do not appear to have been disposed of on the former trial, we think there should also be a new trial ordered.

McCUNN, J.—Joseph Addison and Samuel Addison, drygoods merchants, transacting business at Nos. 304 and 306 Canal-street in this city, under the firm of Addison Brothers, commenced purchasing goods from the plaintiffs' firm of Loeschigk, Wesendonck & Co., in the year 1860. By July or August of that year the indebtedness on this account amounted to nearly $10,000. On opening the credit, Samuel D. Addison represented to the plaintiffs that the firm had a capital of $45,000 in stock and receivables; that he and his brother had been and would be careful in their business; that no fear need be entertained of their solvency; that they had an estate from their mother, and upon the death of their mother would be perfectly independent. Joseph Addison died on the 13th February, 1861. The plaintiffs recovered judgment for $6,806.32, a part of their demand against Samuel D. Addison as survivor, in this court on the 26th of June, 1861.

They recovered a like judgment for $2,263.95 in the Supreme Court in this district, Samuel D. Addison being a resident in the county of Kings. Transcripts of these judgments were filed in that county, and executions issued thereon accordingly to the sheriff thereof. Both executions were returned wholly unsatisfied.

This action was commenced on the 15th of April, 1862, against the surviving partner and his wife, and Amos F. Hatfield and Jesse A. Marshall, alleging that the several dispositions of property, which will be hereafter stated, were made with intent to hinder, delay, and defraud the creditors of Addison Brothers, and especially the plaintiffs, and were therefore void. Samuel D. Addison died during the pendency of this action, and his widow, Rachel A. Addison, having taken out letters of administration, the action was regularly continued against her as administratrix.

The action was tried before Mr. Justice Barbour, without a jury, and a judgment given from which all parties have appealed.

Immediately upon the death of Joseph Addison, his brother, Samuel D. Addison, caused to be prepared an inventory of the goods remaining on hand. They were invoiced at $65,000, and Samuel D. Addison assuming power so to do as surviving partner of the firm of Addison Brothers, executed a bill of sale, dated February 20, 1861, transferring the whole stock to the firm of Hatfield & Marshall for the nominal consideration of $45,512.85. The latter firm took immediate possession of the goods and removed them to a store in Walker-street. The answers allege that the goods were not in fact worth more than $36,000, and that the bill of sale was made on the consideration and with the intent to secure debts due from Addison Brothers to Amos F. Hatfield and Jesse A. Marshall individually, amounting to over $45,000, for moneys lent to Addison Brothers between September 16, 1859, and January 18, 1861. Hatfield testified to loans by himself amounting to $24,500, and Marshall testified to his own loans, amounting to $20,000. Hatfield was the father-in-law of Samuel D. Addison, and Marshall's loans were made at Hatfield's request.

The defendants, Hatfield & Marshall, do not claim that this

was a purchase of the goods for the price stated in the bill of sale, or that the goods were accepted in payment or as a satisfaction for the debts due to Hatfield & Marshall respectively. On the contrary, they allege that they were received merely as a security for their demands, and set up good faith and diligent endeavor to sell the same to advantage; that they have not been able to realize on such sales already made at a greater rate than 60 per cent. on the invoices, and that they do not expect to realize more than $36,000 on the whole of them.

Soon after this transfer, two actions were brought against Hatfield & Marshall for certain portions of the goods, amounting in value to $8,000 or $9,000.

Receivables of Addison Brothers, i. e., bills, notes, and accounts, were delivered to the Pacific Bank, to secure an alleged indebtedness to that bank. No particulars of these transactions appeared, except that the transfers to the bank were dated February 20 and 21, 1861. On March 2, 1861, Samuel D. Addison, as surviving partner, &c., by an assignment of that date transferred to Hatfield & Marshall the residuary interest in these receivables, to indemnify Hatfield & Marshall against damages arising from the failure of title in case the said stock of goods, or any part thereof, should turn out not to be in said Hatfield & Marshall, either by the result of the said then pending actions, or of any actions which might be brought within a reasonable time, and also " against the costs, expenses, and counsel-fees which they may be put to in defending any such action or actions."

Addison Brothers held a lease of the premises No. 40 Murray-street, in this city, of an annual rent of $5,000, for a term ending May 1, 1864. These premises were underlet at a considerable advance. On February 15, 1861, Samuel D. Addison transferred this term and the subleases to Amos F. Hatfield, and on August 17, 1861, Hatfield transferred or surrendered the lease for a consideration amounting to about $1,350.

This transfer is alleged to have been made to secure Hatfield for his accommodation indorsement on a note of Addison Brothers for $2,558.97, and for $800 lent them. Prior to September 15, 1857, Samuel D. Addison had a title to five lots of land in the city of New York, derived from his father. At

that date he conveyed these lots to this same Amos F. Hatfield, his father-in-law. This is admitted to have been a voluntary conveyance for the benefit of the grantor's wife. A pecuniary consideration of $13,000, expressed in the deed, is alleged by the defendants to have been inserted by a mistake of the scrivener.

The plaintiffs allege that at the time of this conveyance Addison Brothers were indebted to the amount of $80,000, and from that time until the failure in 1861 continued to be largely indebted, and at no time in a less sum than $80,000. Joseph Addison in his answer did not deny this allegation, or any part of it, except that he reduced the aggregate to $75,000. He alleged, however, that " all his then indebtedness (meaning of course at the time of the conveyance) had been paid or discharged before he contracted the debts to the plaintiff." He also says that " the conveyance was voluntary, and intended to pass the title of the said property to his wife, the said Addison (himself) and the said Addison Brothers still retaining and having sufficient and more than sufficient property to pay all his and their debts."

After her husband's death, Mrs. Addison answered this portion of the complaint in substantially the same terms.

No evidence was given of payment or satisfaction of any debt by Addison Brothers, or either of them, between the conveyance of the lots to Hatfield and the accruing of the plaintiffs' demands. No evidence was given that at the time of that conveyance Addison Brothers, or either of them, had sufficient property to pay $75,000, or, indeed, that they had at that date any property at all.

The debts due from Addison Brothers to Hatfield & Marshall, respectively, consisted in part of $20,000, borrowed on the 14th of September, 1859. Marshall lent them further sums amounting to $10,000 in the same autumn. Hatfield's other loans were in the autumn of 1860, and subsequently.

The losses by Addison Brothers in their business may be deduced from the following circumstances :

The receivables deposited with the Pacific Bank: this sum amounted in the aggregate to " nearly" $40,000. The debt due to the bank was $22,000; Mr. Buck, the cashier, testified that after crediting the amount realized, there remained

due to the bank a balance of about $3,000. The amount realized may therefore be stated at $19,000. Mr. Buck stated the nominal amount of the receivables to be $13,000 or $14,000. There is evidence to show that these are desperate. According to the evidence their whole nominal amount is almost $14,000. From the paper signed by Samuel D. Addison on March 2, 1861, pledging them to indemnify Hatfield & Marshall, it might be supposed that they amounted in round number to $21,000.

Addison Brothers may have had some other unpromising receivables amounting to say $2,000 or $3,000. There is no other evidence of losses by the firm in the regular course of their mercantile operations or otherwise.

It was found at the special term that Samuel D. Addison, on opening the credit with the plaintiffs, made the false representations alleged, and that Hatfield, when surrendering the case, was not aware of the fact that Sterns, one of the under-tenants, was solvent. No other disputed fact was passed upon. As conclusions of law, it was found that the deed of gift of the lots to Hatfield was not fraudulent and void as against the plaintiffs; that the stock of goods transferred to Hatfield & Marshall cannot be reached in this action; that Samuel D. Addison had no power to assign the securities in the Pacific Bank to Hatfield & Marshall; and that the assignment thereof should be declared void. Judgment was accordingly given, that all interest of Hatfield & Marshall and Samuel D. Addison in the said securities, and also certain other securities held by Hatfield, be assigned to a receiver and applied to the payment of the plaintiffs' demand. The action as against Rachel A. Addison individually, was dismissed with costs out of the fund in the receiver's hands, but to be paid by the plaintiffs, if such sums should prove insufficient. The plaintiffs had judgment for their costs against Hatfield & Marshall. The defendant, Rachel A. Addison, on the ground excepted that costs should have been awarded to her against the plaintiffs absolutely.

Hatfield & Marshall excepted to the decision that Samuel D. Addison had no power to assign the securities, and to the award of the costs against them. The plaintiffs excepted to each of the decisions against them.

The first and most interesting question in this case is, whether, upon the dissolution of this firm by the death of his partner, Samuel D. Addison had power, as surviving partner, to assign the whole stock in trade of Addison Brothers by way of preference to two of the creditors. By the common law a simple purchase of lands or chattels by two or more persons created a joint ownership, and upon the death of one before the severance the survivor or survivors took the whole; but it is well settled that this rule does not apply to mercantile partnerships. On the death of a partner his personal representative becomes entitled to his proportionate share of all chattels belonging to the firm, a tenant in common with the surviving partner or partners. (*Williams on Personal Property*, 219, 220; *Co. Litt.*, 181, a; Rex *a.* Collector of Customs, 2 *Maule & Selwyn*, 223.) Mr. Justice Story, in his Treatise on the Law of Partnership (§ 90), shows that partners do not occupy towards each other precisely the attitude either of joint tenants or of tenants in common, and as to the point in hand he says: "There is no survivorship in cases of partnership, as there is in joint tenancy. This has been the doctrine of the common law for more than three centuries." Again, in section 342, he says: "Here the remark already made becomes important, that a partnership is not, strictly speaking, either a joint tenancy or tenancy in common; and it is a universally established principle of the whole commercial world that the property and effects thereof do not belong exclusively to the survivors, but are to be distributed between them and the representatives of the deceased in the same manner as they would have been on a voluntary dissolution *inter vivos*."

The point was subjected to a most searching and thorough investigation by the English Court of Exchequer, in 1857, when Judge Story's doctrine was distinctly affirmed in a unanimous judgment. Buckley *a.* Barbour, 6 *Exchr.*, *Welsby, H. & Gord.*, 164; see Kemp *a.* Andrews, 3 *Levins*, 290.)

It is, therefore, quite clear that, at least in respect to one moiety of this stock in trade, Samuel D. Addison had no title, nor any authority whatever to convey it. The same principles apply to the lease and sublease of the Murray-street store.

In the choses in action belonging to the partnership, held by the Pacific Bank, Samuel D. Addison had, by survivorship, the

sole right of action, and consequently he had what may be called the legal title. But he held this merely as trustee; for in equity the share of the deceased partner in his portion devolved on his representatives. (*Williams on Personal Property*, 220, and cases cited in notes.)

The sweeping dispositions made by the surviving partner immediately upon his brother's death bear strong *indicia* of a fraud.. The whole stock in trade, the leasehold interest, in fact every scrap of property belonging to the firm, except the choses in action, was transferred within a week to the survivor's father-in-law, and the choses in action soon went in the same direction. Viewed merely as a preference of one favored creditor over all others, this series of transactions is subject to many unfavorable observations. Its effect upon the present plaintiffs presents a case demanding relief, if the law can afford it. These plaintiffs were induced to sell their goods on credit to Samuel D. Addison, in 1860, on a false and fraudulent representation by him that he owned the inheritance that had come to him from his father, and that his firm had a fair capital in hand. When the representation was made, the paternal estate had been transferred to his father-in-law, Hatfield, as a gift to Hatfield's daughter, and the pretended capital, if any there was, consisted of loans made by the same Hatfield, whose confidential creditor stood ready, with the co-operation of his son-in-law, the fraudulent purchaser, to make that very capital an excuse for seizing, in satisfaction of his demand, the identical goods they purchased from the plaintiffs. Doubtless there was an understanding between Mr. Hatfield and his son-in-law, that, as the phrase goes, his demand should be deemed confidential. But any one, who looks at the effect of the arrangement between them, will be struck with the appositeness of Judge Duer's remarks upon a similar case. He says: " A secret confidence by which the public is deceived, and creditors who were excluded from its knowledge and its benefits are made the victims of their credulity and ignorance, a confidence which in respect to third persons is a source of delusion and an instrument of fraud, assuredly deserves any other name than that of honorable; it is not an agreement that it implies, but a conspiracy." (Nicholson a. Leavitt, 4 *Sandf. Sup. Ct. R.*, 281.)

The bill of sale was not truthful. It professed to be a sale as for a cash payment, and recited dollars and cents, so as to give it the color of a business transaction. The precise motive of the prompt removal of the stock to another store is not explained, but it looks very like a precaution to avoid the presumption of fraud, which attaches to a transfer by a debtor in failing circumstances if unaccompanied by a change of possession. Considering that the transaction was between confidential friends, father and son-in-law, that Addison Brothers had no longer an existence or need of a store, this prompt change of location, with the careful notice of the fact in the agreement pledging the choses in action, is like that over-caution which is one of the settled *indicia* of fraud, which evince a diffidence in the rectitude of the transaction and excites a corresponding solicitude to provide defences for its protection. (Sands *a.* Codwise, 4 *Johns.*, 567, 591; 3 *Desausure*, 291.)

It is not necessary to follow to their conclusion the grave suspicions that attach to this transaction. The transfer of the choses in action, as an attendant upon it, is subject to so many objections that it cannot be sustained. A surviving partner of a dissolved firm conveys all its stock in trade to his father-in-law, a favored creditor, including at least one interest which he had no power to convey; and then mortgages all the remaining estate of the firm to the same creditor, as an indemnity not only against any failure of title, but against the remotely contingent future expenses which he may incur for counsel or otherwise, in defending all actions which any one may bring against him to test the validity of the conveyance.

No limit is assigned to the number or character of the suits thus indemnified against. They are required, indeed, to be commenced within a reasonable time; but how long a time is that? When will they terminate? This surviving partner has ordained that the business creditors of Addison Brothers must stand still, "in patient expectation," until the father-in-law shall have run the gauntlet of the law in any number of actions and defeated all opponents; and must then be contented with what may be left for them after that gentleman shall have liberally compensated his counsel for their achievement in his

behalf. Such an act carries the much-abused privilege of giving preference far beyond any thing which has hitherto been tolerated. If it had no other fault, its inevitable effect to delay creditors to an indefinitely remote period marks it for condemnation as falling within the very letter of the statute, and wholly indefensible on this very ground.

It is adjudged to be fraudulent for a failing debtor to authorize his voluntary assignee to sell on credit. (Nicholson *a.* Leavitt, 2 *Seld.*, 517; 3 *Kern.*, 219; 17 *N. Y.*, 17.)

The transfer of the receivables was plainly unauthorized by law and a fraud upon creditors.

I return to the question of power in the surviving partner to make the bill of sale of the stock in trade, and the transfer of the lease. It may be thus stated.

Having the formal legal title to an individual portion of the chattels, and the entire formal title to the choses in action which constituted the stock in trade of the firm, has a surviving partner the *jus disponendi* even of what is thus legally vested in him, so that he can exercise the power of making an assignment of the whole property to a favored creditor, to the exclusion of all others having demands against the dissolved copartnership?

The firm-creditors have in equity a preference over creditors of the individual partners; and on the other hand, the creditors of the individual partners may justly insist that the firm-assets be applied to the payment of the firm-creditors before resort is had by such creditors to the individual assets. An individual creditor of one partner cannot acquire by purchase under his execution any right in chattels of the partnership, except to have an account and possess himself of what interest shall be found remaining to his debtor after settlement of the partnership affairs, and payment of all the joint debts. (Garbetter *a.* Veole, 5 *Ad. & Ellis* [5 *Queen's Bench R.*], *N. S.*, 408; Burton *a.* Green, 3 *Car. & Payne*, and cases in notes; Walsh *a.* Adams, 2 *Den.*, 128.)

This is all the right an individual partner's creditor can acquire in the firm-property. Surely the individual partner himself has no higher right. Our law does not contemplate that a debtor shall have title to chattels which his creditor may not sell on execution. During the existence of the firm each part-

ner, in the ordinary course of business and as agent of the joint concern, may sell the joint property and convert it into money or other property for the use of the firm, and he may therewith pay the debts of the concern; but this is the whole extent of his power. He cannot lawfully step aside from the ordinary course of business, and assign the partnership effects to a trustee even for the payment of the partnership debts, giving preference. (Havens *a.* Hussey, 5 *Paige*, 31; Stevens *a.* Brown, 9 *Upper Canada Law Jour.*, *Ch.*, 110.)

While the partnership continues, no individual partner can lawfully divert the property, or any part of it, from the purposes of the copartnership; nor can he, as we have seen, lawfully apply it even to those purposes, except in the ordinary and usual course of the business, so that his act may be imputable to the partnership itself, acting by one of its members as its agent. It is not easy to find in the reason of things an authority in one partner acting on his own motion, and without the consent of his fellows to transfer the whole estate and effects of the partnership to one favored creditor in payment of his demand, thereby virtually terminating the business and leaving all other creditors unpaid. If this be a lawful exercise of one partner's *jus disponendi*, as supposed by the chancellor in Egberts *a.* Wood (3 *Paige*, 517), the privilege is fraught with incalculable dangers, and the decision of the question whether it exists had best be deferred until a necessity for its decision shall arise. No such necessity exists in this case. Here the partnership had been dissolved by the death of one partner. The choses in action certainly constituted a trust-fund for the payment of debts, and it seems to me that the stock in trade and lease were equally subject to that trust. The question, then, is, had the survivor power to exercise a partiality in the performance of this trust, or was he bound to administer the property *pro rata?* I will not deny that all the partners of a joint concern have together the entire title and absolute right of property. Having therefore the entire and uncontrolled *jus disponendi*, it follows that, in the absence of fraud, any one of them, pursuing the usual course of business, may dispose of the partnership effects; and the concurrent act of all the partners, though entirely outside of the ordinary range of partnership business, may actually extinguish the whole joint interest.

(Dimon a. Hazard, *Ct. of Appeals*, March, 1865. Reported in the *Tribune*.)

But a dissolution by the death of a partner gives rise to a very different state of things. The partnership is at an end, consequently all powers which the survivor once had, founded on the mere existence of that relation, must cease. The deceased had in his lifetime power to concur in giving preferences; but this power is by express statute denied to executors. The survivors' right to the copartnership property may be diminished, but surely it cannot be increased by the dissolution. Upon what principle, then, is it that he is claimed to have a right to give preferences? Manifestly he cannot do so in respect to his deceased copartners' share in the chattel property of the firm. It seems to me equally manifest that he cannot in respect to the choses in action; for here the equitable title to the deceased partner's share is in his personal representatives, and he is forbidden to give preferences.

In truth, the only ground on which any authority at all over the partnership assets can fairly be claimed for the surviving partner, before the payment of debts is, that the legal entity which owned the property having ceased to exist, the surviving partner occupies an attitude which makes him the fittest administrator of the fund. If allowed to assume this duty, it must be as trustee for all parties in interest, and he should not give preference.

As the legal title to choses in action survives, the surviving partner may collect them; as the legal joint liability survives, the copartnership creditors have their remedy by judgment and execution at law against the survivor.

In this way preference may be acquired at law by the creditors who are most vigilant, but there is a means of preventing injustice from that source. Any creditor who apprehends loss of his demands by such means may go into equity and obtain an equal distribution. This is usually done through the agency of the deceased partner's personal representatives. (Payne a. Hornley, 27 *Law Journal, Ch.*, 689; 4 *London Jurist, N. S.*, 446.) But the right of the creditor to proceed directly in his own behalf is indisputable. (Brett a. Beckwith, 26 *Law Journal, Ch.*, 130; 3 *London Jurist, N. S.*, 32, 33; see also *Story on Partnership*.)

Learned judges have confessed themselves unable to define the precise quality of a surviving partner's interest in the assets of the firm. (7 *Paige*, 34.) But the decision is fairly established as the law at this day, that on such a dissolution the assets are, in the first instance, applicable to the payment of the copartnership debts; and, at the instance of any party in interest, equity will restrain any attempt to divert them from that object. (Newell *a*. Townsend. 6 *Simons*, 419.) If the surviving partner is not a trustee for this purpose, he cannot fairly be considered as having any other authority; and if he be such trustee, then surely, like all other trustees, and especially since the Revised Statutes of 1830 have forbidden the application of the deceased partner's share in any other way, he is bound to distribute *pro rata*, according to the maxim that equality is equity. Upon the whole, I cannot resist the conclusion that the bill of sale of the goods, and the transfer of the lease and sublease was, even in respect to the technical share of the surviving partner, an unauthorized preference, and void as against the copartnership creditors.

If this general objection to the transfer of the stock in trade be not maintainable, still, upon settled principles, the transfer was unauthorized and a fraud upon creditors. It has been thought that one partner might sell, deliver, or assign the whole partnership stock directly to a creditor, in payment of his demand. But it is clear that he has no right to transfer the whole property to a trustee to sell the same for the payment of the debts. This is upon the principle *delegatus non protest delegare*. Each partner is by the agreement of the partnership impliedly constituted agent of the firm, with full authority to sell and pay debts in the usual way. Delivering the property to the creditor is merely doing directly what he had power to do circuitously. So in Egberts *a*. Wood (3 *Paige*, 517), the chancellor decided that one partner might make a valid assignment of partnership effects, and directly to the creditor in payment of his demand, though the effect of such assignment was to give a preference to one set of creditors over another. But in Havens *a*. Hussey (5 *Ib.*, 30) the same learned jurist decided that one partner could not assign the goods to a trustee for this purpose. Now, according to the answers of the defendants, the goods in question were not delivered to Hatfield

Loeschigk *a.* Addison.

& Marshall in payment or on account of their demands. On the contrary, they were appointed agents or trustees of the co-partnership to manage the goods according to their discretion, to sell them and to apply what might be realized from such sales in satisfaction of their respective demands. Surely this is a transfer of the partner's power and duties in respect to the administration of the firm-estate to third persons. It is precisely equivalent in its nature and consequences to a transfer to a trustee or agent for like purposes. It is therefore void.

The judge at the special term does not seem to have arrived at any different conclusion. His decision is merely that the goods "cannot be reached in this action." The justice of the plaintiffs' claim, and the injustice of placing these goods beyond the reach of process on their judgment at law, is not denied ; but from some reason of a formal or technical nature, which is not disclosed, this action is deemed an inapplicable remedy. This is not apparent to me. The plaintiffs were co-partnership creditors; they proceeded to judgment at law in the only known form—*i. e.*, against the surviving partner. Before the judgment could be obtained, the surviving partner and the defendants Hatfield & Marshall had made away with the property, so that it could not be reached by execution. The plaintiffs exhausted legal diligence against the surviving partner by issuing executions into the county of his residence, which were returned unsatisfied, and this gave them a right to proceed in equity against the property of their debtors of every description. (3 *Rev. Stat.*, 5 ed., 264, § 43.) It is familiar practice to include in such action as defendants all persons who may have co-operated with the debtor in defeating the legal remedies of the creditor. Besides, according to the principle before referred to, those plaintiffs as creditors of the dissolved partnership had a right to the aid of equity in enforcing a proper distribution of the firm assets. It may possibly be that, as matter of form in this aspect of the action, there should have been an administrator of Joseph Addison, and he should have been made a defendant. Perhaps, also, the other creditors, if any there be, of Addison Brothers, ought in some form to have been parties ; but if this be so, it is not a ground for denying relief or dismissing the action. Under the former practice in chancery it was firmly established that the bill should not be

dismissed for want of parties, especially if the objection was not taken by demurrer or in the answer.

The settled practice was to direct the cause to stand over, to the end that the requisite parties might be brought in by amendment or supplemental bill. The Code has adopted this practice, and made it imperative upon the courts. Section 144, subd. 4, provides that for a defect of parties apparent on the face of the complaint the defendant may demur. Section 147 provides that if the objection do not appear on the face of the complaint, it may be taken by answer; and the next section provides that if not taken either by demurrer or answer, the defendant shall be deemed to have waived it.

Consequently there was no fatal or incurable defect of parties. Whether or not the legal diligence of the plaintiffs entitled them to a preference, leaving the surplus for distribution amongst the other creditors of Addison Brothers, need not now be decided. Perhaps on a full investigation there may be no other creditors, or the assets may prove sufficient to pay all the debts.

The remaining question is, whether Samuel D. Addison's gift of his patrimonial estate to his wife is sustainable. 3 Rev. Stat., 5 ed., 224, § 1, declares that every conveyance of any interest in lands, made with intent to hinder, delay, or defraud creditors or other persons of their lawful demands, shall, as against the person so hindered, delayed, or defrauded, be void. This is a re-enactment of an ancient English statute, and is merely declaratory of the common law. (Hamilton a. Russell, 1 *Cranch*, 316.)

It was determined by the courts that indebtedness of a grantor, at the time of a voluntary conveyance founded on the consideration of natural love and affection, is not conclusive evidence of fraud in such conveyance. (Jackson a. Seward, 8 *Cow.*, 406, last point in Syllabus.) In Hinde's Lessee a. Longworth (11 *Wheat.*, 213) it is said that "the mere fact of being in debt to a small amount would not make the deed fraudulent, if it could be shown that the grantor was at the time in prosperous circumstances and unembarrassed." The 4th section of this same title of the Revised Statutes adopted these decisions. (See Revisers' note, 3 *Rev. Stat.*, 2 ed., 658.) But the absence of a valuable consideration, and the fact of the grantor's being

deeply indebted at the time of the conveyance, has always been deemed to raise so strong a presumption of the fraudulent intent that, without some explanatory circumstances—as, for instance, such as are referred to in the case cited from Wheaton's Reports—the transaction will be deemed void as against subsequent creditors. (Wadsworth *a.* Havens, 3 *Wend.*, 412.) That subsequent creditors are within the words of the statute, as well as within the mischiefs it was designed to suppress, was decided by HARDWICKE, in Taylor *a.* Jones (2 *Atk.*, 601), and his decision was approved by Chancellor KENT, in Reade *a.* Livingston (3 *Johns. Ch.*, 481.) He notices the distinction between creditors existing at the time of the conveyance and subsequent creditors. From the mere fact of the gift being voluntary and without a valuable consideration, fraud may be an inference of law as to the former ; but as to subsequent debts there is no such necessary legal presumption, and there must be fraud in fact. He thus defines the requisite proof of such fraud in fact : " The indebtedness at the time, though not amounting to insolvency, must be such as to warrant the conclusion." In another place he says : " Subsequent creditors would be required to go so far, and only so far in showing debts, as would be sufficient to raise a reasonable presumption of a fraudulent intent." These principles have been reiterated in the adjudged cases times without number. They are the conclusions of common sense upon a pure common-law question. If a trader, deeply in debt, not proven to have had at any time property sufficient to pay his outstanding liabilities, without any special reason or present particular inducement, makes a gift of his real estate to his wife or child, what can be supposed, at the very best, but that his motive was to cast upon his creditors, existing and subsequent, all the risk of his trade, and to preserve his capital for the benefit of himself and his family. This is a fraudulent act. (Twyne's Case, 3 *Coke*, 83.) In the recent case of Carpenter *a.* Roe (6 *Seld.*, 227), Judge GARDINER thus delivers the opinion of the whole court : " To avoid the conveyance and trust in favor of his wife, it is not necessary that the debtor should be insolvent, or believe himself to be so, when they were executed or created. It was sufficient that he was indebted, and that insolvency would be the inevitable or probable result of a want of success in the business in which he was engaged. He could

not legally and honestly in this manner provide for himself and his family, and cast upon his creditors the hazard of his speculations." After such a lucid exposition by our highest tribunal, it cannot be profitable to enlarge upon this topic. Such is the rule of law ; now let us recur to the facts.

The plaintiffs brought the case distinctly within the rule by alleging that a very large indebtedness existed at the time of the gift, and that thence until the failure such indebtedness was not diminished. The indebtedness is admitted, and the continuance of debt until the failure is admitted. That there was any reduction of its gross amount is not pretended in the answer, nor is there in the evidence the slightest color for a surmise that it would have been reduced. On the contrary, the loans obtained from Hatfield & Marshall after the gift in question, were obtained, not to pay debts with, but to increase the business. The answers assert that the debts existing at the time of the gift were paid. This is an affirmative alleged by way of avoidance. The burden of proving it devolved on the defendants. They have offered no evidence whatever in support of it. But even if such were the fact, it would not avail to repel the presumption of fraudulent intent. From the admissions in the answers, it must be understood that the debt of this firm, like the liabilities of most mercantile concerns, constituted an unbroken stream of equal volume, from the time of the gift to the time of the failure. The stream continued the same alike in all essentials, though the particles of which it was composed were constantly changing. Such an allegation is frivolous in point of reason, and, according to all authorities, totally unavailing in point of law. The authorities are collected, and their result stated with admirable exactness by the learned editors of the American Leading Cases. (1 *Hare & Wallace,* 4 ed., 40, 41.)

The allegation that the firm or the partners had at the time of the gift sufficient money to pay their debts, independently of this real estate, was material and relevant, and, if proven, might have sanctioned the gift. But this also was an affirmative, and the burden of proving it devolved upon the defendants. No evidence whatever was offered in support of it. Though not necessary to the condemnation of this transaction, it may properly be added that all reasonable inferences from the circumstances before the court are against the allegation. The

plaintiffs were not bound by law to disprove this averment, and indeed, it would be in the highest degree unreasonable to exact from them proof of such a negative. · The proof was most accessible to the defendants; the plaintiff had very slender means, if any, to ascertain the facts.

The conveyance was a mere gift; it was called for by no special exigency ; it was made by one in trade heavily indebted, and who continued so in debt until he sank into disastrous insolvency. The grantor contracted the debt in question by means of a false and fraudulent representation that no such gift had been made, and soon afterwards failed, transferring the very property obtained by his false and fraudulent representations to the same member of his family who was his agent and cooperator in making this gift. I do not assert that fraud or not is a question of law. I admit that, in its very nature, it is a question of fact. But on such a state of facts, wholly unexplained and uncontradicted by any proof whatever, the fraudulent intent alleged in respect to this gift is an irresistible inference. (Vance *a.* Phillips, 6 *Hill*, 435, 436.) These lots lie in the city of New York; the plaintiffs' judgments are both liens upon them. The conveyance to Hatfield and Mrs. Addison should have been declared fraudulent and void as against the plaintiffs. Their judgment at law might then be executed upon them, or this court might direct a sale by a receiver, requiring all parties to join in the conveyances, and apply the proceeds among the creditors according to law. (Per TRACY, Senator, McElwain *a.* Willis, 9 *Wend.*, 567, 568.)

The appeals of the defendants should be dismissed, with costs, and a new trial directed on the plaintiffs' appeal.